BASIL TUMOLILLO AND THERESA TUMOLILLO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tumolillo v. Commissioner
Docket No. 22524-80.
United States Tax Court
T.C. Memo 1983-96; 1983 Tax Ct. Memo LEXIS 687; 45 T.C.M. (CCH) 768; T.C.M. (RIA) 83096; February 14, 1983. *687 Basil Tumolillo, pro se. Alan E. Cobb, for the respondent. DRENNEN
MEMORANDUM OPINION DRENNEN, Judge: This case was assigned to and heard by Special Trial Judge John J. Pajak pursuant to the provisions of General Order No. 6, 69 T.C. XV (1978). The Court agrees with and adopts the Special Trial Judge's Opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes, and additions to tax under section 6653(a), as follows: Year
Deficiency
Addition to Tax
1971
$2,968.34
$148.42
1972
$2,147.85
$107.39
1973
$2,136.54
$106.82
1975
$1,037.29
After concessions by the parties, the remaining issues for decision are: (1) whether respondent properly applied the bank deposits-cash expenditures method in reconstructing petitioners' income; and (2) whether petitioners are liable for additions to tax under section 6653(a). [1]
*688 FINDINGS OF FACT Some of the facts have been stipulated.The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Basil Tumolillo and Theresa Tumolillo, husband and wife, resided in West Berlin, New Jersey, when the petition in this case was filed. Petitioners filed joint returns for all the years in issue.[2]
Sometime in early 1971, petitioner Basil Tumolillo (petitioner) entered into a partnership with Vincent and Jeanne Mascio, a married couple. The Mascio-Tumolillo *689 (M-T) partnership was formed for the purpose of owning and operating a pinball arcade but the parties ultimately decided to open a restaurant.The restaurant opened in May 1971, but was forced to close 67 days later when the premises were flooded. Petitioner had no records concerning the financial affairs of the M-T partnership. Apparently the M-T partnership continued through 1971, 1972, and 1973, at least to the extent that the partnership was holding real property. Petitioners' 1971 income tax return shows, without supporting details, a $4,144.20 loss from the partnership. The partnership does not appear on petitioners' 1972 return and neither party raised this at trial. The partnership reappears on petitioners' 1973 return, albeit with a different address, with reported income of $84.00. [3] The M-T partnership does not appear on the partnership schedule of the 1975 return. *690 On their 1971 return, petitioners reported no income but claimed the loss from the M-T partnership. On their 1972 return, petitioners reported no income other than a net capital gain of $8,503.00 from the sale of a private residence. On their 1973 return, they reported $84.00 from the M-T partnership, $1,400.00 in rental income, $1,518.00 in net capital gain, and $6,000.00 in commissions for a grand total of $9,002.00. No occupation was listed for either petitioner on each of the aforesaid returns. It is unnecessary to detail $17,278.00 in income reported on their 1975 return. That return listed petitioner as self-employed and his spouse as a housewife.
During the years in question, petitioner claims he was involved in a number of ventures. As in the case of the M-T partnership, petitioner was unable to produce any records concerning any ventures. In the absence of any records or books, respondent employed the bank deposits-cash expenditures method of reconstructing petitioners' income for the years 1971, 1972, and 1973. In determining the deficiencies for those years, respondent included in income deposits not traceable to a nontaxable source. During 1971, 1972, and 1973, *691 petitioners maintained a checking account with the Continental Bank, Norristown, Pennsylvania (Continental), and another account in Fidelity Bank, Philadelphia, Pennsylvania (Fidelity). The record does not indicate whether the latter account was a checking or savings account. During 1971, petitioner made 48 separate deposits to the Continental checking account totaling $40,288.96. Virtually all the deposits were made in cash and ranged in size from $50.00 to $12,545.00. In addition, petitioners deposited $120.00 in 1971 to their Fidelity account. During 1972, petitioners made 57 deposits to their Continental checking account totaling $63,877.78.The deposits ranged in size from $100.00 to $27,428.14 and were almost all cash deposits. They also deposited $113.75 to their Fidelity account. During 1973, 16 deposits, virtually all in cash, were made to petitioners' Continental checking account totaling $39,260.48. [4] The deposits ranged in size from $75.00 to $12,500.00. In addition, petitioners deposited $56.00 in their Fidelity account and $275.00 in a Christmas Club account in an unspecified institution. Petitioners also made a cash outlay of $22,421.35 during 1973. The *692 total of their deposits and cash expenditures for that year was $62,012.83. After determining the total deposits for each of the years involved and the cash outlay for 1973, respondent subtracted all of the identifiable deposits made from nontaxable sources. These sources included the proceeds from loans, savings account withdrawals, mortgage payments from Mr. and Mrs. Mascio, proceeds from the sale of petitioners' residence, proceeds from the sale of stocks and a cash hoard. [5] Respondent determined that the total received by petitioners from nontaxable sources and reported income was: 1971
[6] $16,479.88
1972
$49,415.54
1973
$56,237.36
*693 Respondent made a number of other adjustments in arriving at petitioners' taxable income for 1971, 1972, and 1973. These adjustments were not challenged by petitioners and therefore they are deemed conceded. The deficiency for 1975 results from the disallowance of $1,863.76 in real estate tax deductions claimed by petitioners and from respondent's determination that petitioners failed to report long-term capital gain in the amount of $165.00. At trial, petitioners conceded the real estate tax issue. Since petitioners did not raise the capital gain issue in either their petition or at trial, it is also deemed conceded. Therefore, the deficiency for 1975 is no longer in issue. All subsequent discussions in this opinion shall be with reference to 1971, 1972, and 1973, the only years remaining in issue. OPINION Petitioners' taxable income for 1971, 1972, and 1973, was reconstructed by means of what is commonly known as the bank deposits-cash expenditure method. This method was used by respondent because of petitioners' failure to produce any books or records for the years in issue. It is a well established rule that in the absence of appropriate books and records, respondent *694 may use the bank deposits-cash expenditures method to reconstruct a taxpayer's income. , , affd. . It has repeatedly been held that a presumption of correctness attaches to such a reconstruction and that the taxpayers have the burden of overcoming that presumption. In short, petitioners bear the burden of proving that respondent's determination is erroneous. ; Rule 142(a). Petitioners argue that respondent has applied the method incorrectly. Except for the one amount conceded by respondent, we disagree. Set forth below are the amounts deposited in petitioners' various bank accounts during the years in question: Year
Deposits
1971
$40,408.96
1972
$63,991.53
1973
$39,591.48
Petitioners do not contest the fact that the deposits were made, but allege that much of the money deposited came from nontaxable sources.
Petitioner testified that some of the deposits *695 in petitioners' accounts reflected monies coming from the Mascios as a result of the M-T partnership. These payments supposedly represented the Mascio's share of the partnership expenses. Petitioner claimed that the total received from the Mascios was between $15,000.00 and $20,000.00, apparently all in 1971. Respondent, however, determined that only $4,106.07 was received from the Mascios; $1,164.78 in 1971, $1,261.84 in 1972, and $1,679.45 in 1973. Petitioners failed to convince us that any amounts other than those allowed by respondent were received from the Mascios. Nor is petitioners' case helped by the testimony of Jeanne Mascio. She said that a number of payments were made by her husband and herself to petitioner in cash and by check in 1971. According to her testimony, the payments ranged anywhere from $50.00 to $5,000.00. We found Mrs. Mascio's testimony to be vague and inconclusive. She could not remember the dates the alleged payments were made or the total amount that was supposedly paid. Although she claims that at least some of the payments were made by check, no tangible evidence was introduced at trial. Furthermore, we do not believe that the Mascios had *696 the resources with which to have made the claimed payments in 1971. The Mascios' Pennsylvania income tax return for 1971 was introduced into evidence by respondent. This return showed the Mascios' gross income to be only $6,143.02 from wages. We are not persuaded that a couple with that level of income in 1971 could have paid petitioners somewhere between $15,000.00 and $20,000.00. Since the Pennsylvania return showed no interest or dividend income, we are not convinced that the Mascios had sufficient assets from which to have made the payments. Nor do we believe that the payments were made from borrowed funds. No credible evidence of any loans was introduced to support Mrs. Mascio's claims. In short, we have totally discounted Mrs. Mascio's testimony as being improbable and questionable. See . Petitioner contends that portions of the unexplained amounts actually represent money received from petitioner Theresa Tumolillo's mother. This money purportedly represented a $5,000.00 gift to petitioners along with money to pay the mother's personal expenses. The only evidence concerning this money was petitioner's own *697 testimony. We did not find petitioner to be a credible witness, His testimony was evasive, vague and unpersuasive. We are not required to nor do we accept his unsupported testimony. , affg. a Memorandum Opinion of this Court dated June 15, 1949; see also, . Petitioner claimed in his petition that portions of unexplained deposits represent the proceeds from the sale of stock. Petitioner offered no evidence that these proceeds were not reflected in respondent's calculations of unreported income. In fact, the record shows that income from stock sales was taken into account by respondent. Petitioner also contended in his petition that part of the deposits represent the proceeds from life insurance loans. Absolutely no evidence was offered on this point. Petitioners have failed to meet their burden of proof for any of the years in question, except for the one amount conceded by respondent. [7] With that exception, which will be reflected in the Rule 155 computation, respondent's deficiency determinations must be sustained. ; *698 Rule 142(a). The second issue concerns whether petitioners are liable for additions to tax under section 6653(a). Petitioners, who bear the burden of proof on this issue, offered no evidence to show that the underpayments were not due to negligence or intentional disregard of the rules. Accordingly, petitioners are liable for the addition to tax under section 6653(a) for each of the years in issue. ; Rule 142(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect for the taxable years in issue, unless otherwise indicated. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
2. Although petitioner Theresa Tumolillo did not sign the joint returns for 1971 and 1975, she stated in a December 11, 1978 letter to the Internal Revenue Service that it was her intention to file joint returns for those years. She also joined in signing the petition for all the years set forth above. Since respondent determined that petitioners filed joint returns, this case is the opposite of the situation in , and therefore we have applied the tacit consent rule in reaching the conclusion that joint returns were filed in 1971 and 1975. .↩
3. Respondent determined that petitioners' partnership income (loss) for 1971, 1972, and 1973 was $2,797.45, ($464.48) and $6,340.97, respectively. It is clear from the notice of deficiency that the first and last amounts relate to the M-T partnership and the middle amount, which was not reported on the 1972 return, apparently was attributed to that partnership.↩
4. Due to an obvious typographical error, this amount was incorrectly shown at one point in the notice of deficiency as $19,260.48. The correct amount, shown above, was included in the total deposits set forth in the notice of deficiency↩
5. On this record, we do not understand why respondent subtracted from the 1971 deposits the $12,000.00 shown on the Fidelity Bank September 29, 1971 personal financial statement of petitioners as "Cash on hand and in Banks." Since this adjustment benefits petitioners, we will not question it. ↩
6. At trial, respondent conceded that the amount shown as receipts from nontaxable sources for 1971 should be increased by $7,545.00. This amount represents the proceeds from a loan received by petitioners during 1971. Respondent mistakenly had given petitioners credit for this deposit in 1970, a year not before us.↩
7. See footnote 6.↩